Edward M. State and Lorraine State v. Commissioner.
State v. Commissioner
Docket No. 1603-67.
United States Tax Court
T.C. Memo 1968-285; 1968 Tax Ct. Memo LEXIS 13; 27 T.C.M. (CCH) 1522; T.C.M. (RIA) 68285; December 12, 1968, Filed Richard D. Hobbet, Craig M. Hunt, 5th Fl., 626 E. Wisconsin Ave., Milwaukee, Wis., and J. Bruce Donaldson, for the petitioners. Denis J. Conlon and Robert P. Burke, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency in petitioner's income tax for 1956 in the amount of $280,386.81. The issues are: (1) Whether petitioners realized income as a result of the transfer by Edward M. State to a corporation controlled by him of his interest in Farmington Funding Corporation in return for cancellation by the controlled corporation of State's indebtedness *14 to it and the assumption of certain liabilities owed by State; (2) Whether the transactions giving rise to the income occurred in 1955 or 1956; and (3) Whether the year 1956 is barred by the statute of limitations. Findings of Fact Some of the facts were stipulated and they are herein included by this reference. Edward M. and Lorraine State, husband and wife, were residents of Belgium, Wisconsin at the time the petition in this case was filed. They filed a joint income tax return for 1956 with the district director of internal revenue at Milwaukee, Wisconsin. Edward M. State will hereinafter be called the petitioner. During the period here relevant State Foundry & Machine Company (hereinafter called State Foundry) was a Wisconsin corporation with its principal place of 1523 business at Cedar Grove, Wisconsin. The principal business of the corporation was the production of gray iron castings. Its officers were Edward M. State, president, Bernard L. Stott, vice-president, and Lorraine M. State, secretary. These three individuals were also the directors of the corporation. The outstanding common stock of the corporation was held as follows: petitioner, 449 shares, Lorraine *15 State, 50 shares, and Bernard L. Stott, 1 share. Prior to 1950 the Atomic Energy Commission established a domestic uranium purchase program and offered incentives in the form of guaranteed markets for uranium ores at favorable prices. Normally, when 40,000 tons of uranium ore had been proven in a specific area the Atomic Energy Commission would establish an ore buying station in such area to stockpile ore and thus encourage additional prospecting and development. If sufficient ore was stockpiled to support about five years of milling operations consideration would be given by the Atomic Energy Commission to the construction of a mill to process the ore. Late in 1957 the Atomic Energy Commission announced a limitation of its domestic procurement program for uranium. This curtailment of the market provoked protests and early in 1958 the Joint Committee on Atomic Energy heard testimony on the problems confronting the uranium mining and milling industry in the United States. In April, 1958 the Atomic Energy Commission after further study decided to expand to a limited extent its domestic uranium procurement and to provide for a limited expansion of milling capacity. Farmington Funding *16 Corporation (hereinafter called Farmington) was a Nevada corporation organized in 1954 for the purpose of operating oil refineries and pipelines and to acquire, explore and develop uranium mining properties. During 1955 the officers of the corporation were: Eugene Williams, president; Robert L. Bartlett, vice-president; and L. U. Lister, secretary-treasurer. The original authorized stock of its corporation was 10,000,000 shares with a par value of one cent, with 8,000,000 shares designated as common and 2,000,000 shares designated as special common. In the fall of 1954 merger negotiations took place between Farmington and Wisconsin Oil Refining Company. Petitioner, who was a stockholder and director of Wisconsin Oil Refining Company, participated in these negotiations. The merger was not consummated. During the merger negotiations, James Burgess, a certified public accountant and resident partner of Alexander Grant & Co., acted as accountant for Wisconsin Oil Refining Company and was involved in the negotiations. At some time during these merger discussions, Burgess and Alexander Grant & Co. were engaged by Farmington as its accountant. Throughout 1955 Burgess was also the accountant *17 for petitioner and for State Foundry. During the year 1955 Farmington had its principal office in Colorado Springs, Colorado. It employed a staff of approximately 20 employees including two or three geologists and a number of supporting technicians. Early in 1955 Farmington employed Marvin C. Chase as chief of its mining division and also employed Allen Bird, a geologist. Immediately prior to his employment by Farmington, Chase had been chief of ore reserves for the Denver branch of the Atomic Energy Commission. Allen Bird had also been employed by the Atomic Energy Commission prior to his employment by Farmington. Later in the year Farmington also employed John Roscoe who left the Atomic Energy Commission to work for Farmington as a mining engineer. In addition to its own staff Farmington engaged Maynard Ayler, a consulting geologist and mining engineer, to act as an independent consultant as to its ore reserve development program. During 1955 Farmington acquired option rights to mineral leases or mineral rights on the following properties: Ralston Creek Mine near Golden, Colorado; Jacobs Place in Cuervo, Texas; and the Flattop Property in Harding County, South Dakota. Farmington's *18 option as to the Ralston Creek Mine expired in November, 1955 and its option for the Jacobs Place property expired in August, 1955. Farmington's option to acquire the mineral interest in the Flattop Property expired in 1960. In addition, Farmington acquired the so-called Stenseth-McCurdy option to acquire the mineral interest in certain acreage in Harding County, South Dakota which it allowed to expire in December, 1955. Pursuant to an underwriting agreement dated June 9, 1955, between Farmington and Batkin & Company, underwriters, Farmington offered 3,000,000 shares of its common stock for sale to the public at $1.25 per share. The underwriting agreement provided that in the event the underwriter failed to 1524 sell a minimum of 1,000,000 shares by August 8, 1955, the underwriting agreement was to expire and the public offering price of $1.25 per share was to be returned to the subscribers. A prospectus dated June 17, 1955, was filed with the Securities and Exchange Commission to describe the proposed issue. As of August 8, 1955, approximately 500,000 shares had been subscribed, which was less than the required minimum, and the underwriting agreement expired. The proceeds of *19 the subscriptions were returned to the subscribers in accordance with the underwriting terms. In 1954 uraniferous lignite deposits were discovered in South and North Dakota. By agreements dated March 9, 1955, and August 1, 1955, Farmington acquired options to purchase mineral deeds on two tracts of land (The Stenseth-Crevier and the Lindahl-Hansen properties) in Harding County, South Dakota. The total purchase price for the two options was $55,000, with $9,000 of this amount paid by Farmington in 1955. These tracts became known as the Flattop Property. Marvin C. Chase supervised the exploratory work done by Farmington on the Flattop Property to determine the extent of the uraniferous lignite deposits. Flattop was completely drilled out on 100foot centers after a high amount of uranium content was indicated by chemical assays made from 10 to 15 core samples. Chemical and radiometric readings were made and probe readings were correlated with chemical assays as part of Farmington's efforts to measure the extent of ore deposits on Flattop. In the process of drilling on the Flattop Property more than one level of uraniferous lignite ore was discovered. The main level was the so-called *20 E Bed, with the F Bed and the F-Rider Bed providing additional reserves. Chase prepared an initial summary of the ore reserves on the Flattop Property under date of August 15, 1955, which indicated the tonnage, grade and gross value of the ore reserves (in proven and probable categories) in various blocks of the property. The summary showed a total tonnage of 51,560 tons with a gross value of $3,568,745. In a note added to the August 15, 1955, report Chase stated that "As of October 6, 1955, further drilling and assay results indicate a total of 41,800 tons proven having a gross value of $2,799,405.00 and probable reserves of 48,000 tons having a gross value of $2,325,000.00. * * *" On November 1, 1955, another report, was prepared by Roscoe under Chase's supervision summarizing the drill hole data from the completed development program on the Flattop Property. This detailed report identified the various drill holes, described samples obtained, showed the thickness of the ore veins and their grades and in some instances described in detail the method by which particular samples were taken. Based on all the data the report showed a total tonnage of ore reserves on the Flattop Property *21 of 48,083 tons (including proven, probable and possible categories) with a total gross value of $3,035,279. Petitioner was elected as a director of Farmington in January, 1955 and on May 16, 1955, he acquired 150,000 shares of Farmington common stock for $1,500. During 1955 he made a series of loans to Farmington as follows: Date
Amount
Source of funds
3/14
$25,000
Security National Bank
4/8
25,000
Security National Bank
4/18
50,000
Citizens Bank
4/29
25,000
Port Washington State Bank
5/2
25,000
State Foundry
6/3
7,500
State Foundry
6/28
25,000
Port Washington State Bank
7/15
10,000
State Foundry
7/22
15,000
State Foundry
8/5
10,000
State Foundry
8/10
20,000
Port Washington State Bank
8/18
20,000
State Foundry
9/7
8,000
State Foundry
9/20
25,000
State Foundry
10/5
15,000
State Foundry
10/25
3,000
Lorraine M. State
11/4
4,500
Lorraine M. State
11/25
29,500
State Foundry
12/2 20,500
State Foundry
Total
$363,000
By late 1955 the financial position of Farmington was difficult. Large amounts of corporate funds had been forfeited and lost upon its failure to exercise its options on various mineral properties. *22 As of December 10, 1955, Farmington was indebted to its three largest creditors in approximately the following amounts: Martin Legere, $137,327; Joseph G. McMaken/McMaken Equipment Co., $106,400; and petitioner, $363,000. In addition, it was indebted to other creditors in the amount of $115,456.55. At a meeting on December 1, 1955, attended by petitioner, Burgess, and petitioner's attorney, the various aspects of petitioner's investment in Farmington were discussed, including tax considerations, and a decision was reached to transfer petitioner's interest in Farmington to State Foundry. 1525 On December 9, 1955, a meeting was held in the Colorado Springs offices of Farmington attended by Farmington's major creditors who were dissatisfied with the management of Farmington because of the heavy expenditures that had been incurred. Marvin C. Chase presented a detailed report on the lignite uranium properties (Flattop) in South Dakota concerning the extent of ore reserves developed by the drilling and evaluation program supervised by him on these properties. The major creditors at the meeting sought control over the expenditure of funds by Farmington and wanted to protect the Flattop *23 properties from being placed in jeopardy by other creditors. As a result of this meeting the following transactions took place: (1) Farmington issued a promissory note dated December 10, 1955, in the amount of $1,200,000 payable to Joseph G. McMaken (one of the major creditors) on or before December 10, 1960; (2) Farmington executed an assignment (dated December 10, 1955) to Joseph G. McMaken of its right, title and interest to the mining lease in Flattop for the purpose of securing the above note; (3) a joint venture was entered into under date of December 10, 1955, by the three major creditors to receive the Farmington note of $1,200,000 and the assignment of the Flattop Property. Proceeds of the note were to be distributed in proportion to the advances made by each joint venturer to Farmington until the amount of $800,000 was paid (which represented the total amount advanced by the three creditors) and thereafter the remaining $400,000 was to be divided evenly among the three creditors; (4) McMaken agreed to advance to Farmington up to $150,000 for the purpose of paying outstanding obligations of the corporation; and (5) Farmington executed a contract (dated December 10, 1955) *24 with MissouriValley Dredging Company under which the latter agreed to do the work for stripping and mining the Flattop Property at a charge of cost plus 10 percent. McMaken was president of the MissouriValley Dredging Company. McMaken advanced $77,000 to Farmington later in December, 1955 and in early 1956 he advanced an additional sum to the corporation for a total of approximately $130,000. Farmington incurred a net loss of $479,953 for the year 1955. Its balance sheet as of December 31, 1955, showed current assets of $63,741 and current liabilities of $83,209. As of that date Farmington's total assets were $855,794 and its total liabilities (including the $1,200,000 note) were $1,283,209. As of December 31, 1955, the "Due From Officers" account in State Foundry's books showed a balance of $191,176.38 (which represented the amounts advanced to Farmington on petitioner's behalf during 1955 in the amount of $185,500 plus some interest paid on his indebtedness). Some time after the end of 1955 an entry was made in State Foundry's books dated as of December 31, 1955, to reflect the assumption by State Foundry of petitioner's debts to banks in the amount of $177,500 which increased *25 the total amount shown as due from petitioner to $368,676.38. Also after the close of the year 1955 the following entry was made on State Foundry's books dated as of December 31, 1955, to reflect the transfer by petitioner to State Foundry of his interest in Farmington: Dr.
Cr.
Mortgage receivable
$514,676.38
Due From Officers
$368,676.38
Deferred Income
146,000.00 The credit of $368,676.38 to the account "Due From Officers" reflected the cancellation of the indebtedness due from petitioner. At the annual meeting of the stockholders of State Foundry held on January 24, 1956, the following resolution was adopted: RESOLVED, that the action of the officers of the company in accepting from Edward M. State the transfer of all of his creditor claims against Farmington Funding Corporation and all his right, title and interest in a certain security assignment of lignite properties in South Dakota and assuming in consideration therefor the obligations of Edward State to banks in the Sheboygan area incurred in acquisition of such claims and rights together with cancellation of Edward State's indebtedness to the company for monies advanced to Farmington Funding *26 Corporation, be and the same is hereby ratified, adopted and confirmed. On the same day the board of directors of State Foundry adopted the resolution that "all action taken by the Stockholders at the annual meeting of Stockholders held immediately previous to this meeting be and the same is hereby approved and confirmed and that the officers of the corporation be and they are hereby directed to take all action and do all things necessary and proper to carry into effect and implement the action taken by the Stockholders." Under a voting trust agreement dated June, 1956, Eugene Williams (Farmington's 1526 president) transferred his stock in Farmington to McMaken, Legere and petitioner as voting trustees. In an audit of the tax returns of State Foundry for the years 1955 and 1956 the revenue agent proposed the imposition of the accumulated earnings tax under section 531 of the 1954 Internal Revenue Code for both years and a 30-day letter was issued to that effect. During subsequent conferences the Appellate Division inquired about petitioner's Farmington investment and its transfer to State Foundry. A settlement was finally reached under which State Foundry *27 would pay a section 531 tax for 1955 and none for 1956. In the report of the Appellate Division reflecting this settlement it is stated that the only dividend distribution by State Foundry prior to December 31, 1956, was a stock dividend declared in 1947. In the instant case respondent determined that petitioner realized taxable income in 1956 to the extent of the cancellation by State Foundry of petitioner's indebtedness to the corporation in the amount of $185,500 and through payments by State Foundry of petitioner's personal liabilities and/or the assumption by State Foundry of petitioner's personal liabilities of $177,500, or an aggregate of $363,000. Opinion The principal issue before us is whether petitioner realized taxable income when he transferred his investment in Farmington to State Foundry in exchange for the cancellation by State Foundry of petitioner's indebtedness to the corporation and its assumption of certain obligations of petitioner. This issue turns upon the valuation of Farmington's interest in the Flattop Property which contained uraniferous lignite deposits. Since the year 1955 is barred by the statute of limitations we must first decide whether the transfer *28 took place in 1955 or 1956. Moreover, the year 1956 is also barred by the statute of limitations unless respondent can show that petitioner omitted from gross income an amount which is in excess of 25 percent of the amount of gross income stated in the return. Section 6501(e), I.R.C. 1954. [1]
We agree with respondent that an effective transfer of the Farmington investment to State Foundry did not take place in 1955. Petitioner met with his accountant Burgess and his attorney John S. Best on December 1, 1955, to discuss petitioner's substantial advances made to Farmington during 1955. The tax aspects of the investment were discussed as well as the advisability of transferring petitioner's investment in Farmington to State Foundry. Although petitioner claims that a decision was reached at that meeting to make the transfer, it does not appear that anything was done during the remainder of 1955 to actually carry out the purported decision. No entries were made, no assignments were executed of existing notes which petitioner apparently held to evidence *29 his Farmington loans, no instruments were drafted to effectuate the transfer. In fact, the evidence shows that on the very next day (December 2) petitioner made a further advance to Farmington in the amount of $20,500 which was recorded in the books and records of State Foundry as a loan by that corporation to petitioner. This would certainly indicate that petitioner was still regarding himself, rather than State Foundry, as the actual investor in Farmington and the owner of any claims existing against Farmington. It was not until some time after January 28, 1956, that Burgess made the so-called adjusting entries on the books of State Foundry indicating that the corporation had acquired (as of December 31, 1955) petitioner's interest in Farmington, and even these book entries were not made until after the audit of State Foundry's books for 1955 had been completed by a staff accountant of the same public accounting firm that employed Burgess. On the basis of all the available evidence we find that the transfer was effectively made in 1956. Respondent contends that petitioner's investment in Farmington was worthless when he transferred it to his controlled corporation State Foundry *30 in 1956 for a consideration of $363,000, consisting of the cancellation by State Foundry of petitioner's indebtedness to the corporation in the amount of $185,500 and by assuming obligations of petitioner in the amount of $177,500, and that as a result petitioner realized ordinary income in 1956 in the amount of $363,000. Petitioner argues that the value of his investment in Farmington was not less than 1527 $368,676.38 [2] when he transferred it to State Foundry and that consequently he realized no income in 1956 as a result of such transfer. During 1955 Farmington, in its search for uranium mining properties, acquired options for mineral rights on several properties including two tracts in South Dakota which are jointly called the Flattop Property. By the end of the year Farmington had allowed all of the options except the Flattop option to expire. Farmington was in a difficult financial position by late 1955 and was indebted as of December 10, 1955, to its *31 three major creditors, petitioner, Legere and McMaken in the respective amounts of $363,000, $137,327 and $106,400 and was also indebted to other creditors in the amount of $115,456.55. In order to provide security for their investment and to acquire control over the expenditure of funds, the three major creditors and Farmington agreed upon the following arrangements as of December 10, 1955: Farmington executed a promissory note in the amount of $1,200,000 to McMaken secured by an assignment of its interest in the mining rights to Flattop, and the three major creditors formed a joint venture to receive the Farmington note and the assignment. Proceeds of the note were to go to the major creditors in proportion to the advances made by them to Farmington until $800,000 had been paid, with the remaining $400,000 to be distributed equally. It was this interest in the note and the related assignment of Farmington's interest in the Flattop Property that petitioner transferred to State Foundry and which was rather loosely described on the latter corporation's books as a mortgage receivable. [3]
*32 Petitioner called two witnesses, Marvin C. Chase and Robert A. Hildebrand, who testified as to the specific fair market value of the Flattop Property as of December, 1955. Chase, a mining engineer who came to Farmington from the Atomic Energy Commission early in 1955, supervised the extensive exploratory work done by Farmington on the Flattop Property to determine the extent of the uraniferous lignite deposits. The entire property was drilled out on 100-foot centers, chemical assays were made and radiometric readings were taken. Written reports were made in August and in November, 1955 indicating the tonnage of ore reserves, the grade of ore in the several blocks of property and the gross value of such ores based upon Atomic Energy Commission price schedules for various grades of ore. The August report was prepared by Chase and showed estimated ore reserves of 51,560 tons with a gross value of $3,568,745. As a result of further drilling and assay results this report was modified to indicate as of October 6, 1955, an increase in both total tonnage and gross value. The November report was prepared by Roscoe, a mining engineer in Farmington's employ, and showed a total tonnage of *33 ore reserves of 48,083 tons with a gross value of $3,035,279. In determining the fair market value of Flattop as of December, 1955, Chase took into consideration the payment of royalties and the cost of stripping and mining the ore. He took into consideration the facts that the Atomic Energy Commission, which controlled the production of uranium at that time, did not yet have an ore buying station in that area nor a mill specifically designed to process lignite ores. He testified that it had been his experience with the Atomic Energy Commission that it would install a buying station if 40,000 tons of proven uranium-bearing ore were established in a given area. He also testified that a buying station, which normally was nothing more than a stockpile of ore on fenced-in land, was the first step toward the construction of a mill to process the ore and extract the desired oxide. Chase also testified that it was his opinion in 1955 that the uraniferous lignite ores (such as those on the Flattop Property) would be sold shortly to the Atomic Energy Commission even though processing difficulties appear to have existed at that time in connection with such ores. Basing his opinion upon these *34 and other considerations not specifically enumerated here, Chase testified that the fair market value of the Flattop Property as of December 1955 was $1,500,000. A second witness for petitioner, Robert A. Hildebrand, also testified as to the fair market value of Flattop. Hildebrand, a consulting engineer in practical mining, was thoroughly familiar with the Flattop 1528 Property and in fact had done extensive feasibility studies in 1962 in connection with the uraniferous lignite properties in the general area. Hildebrand reviewed all of the drill logs, chemical assays and radiometric information compiled for Flattop in 1955. He reduced the estimated reserves to bring the total tonnage to the lower levels of tolerances allowable under Atomic Energy Commission standards in classifying ore reserves. He based his gross value for the reserves on the published price schedules of the Atomic Energy Commission for uranium ore. He considered (among other items) royalty costs, drilling and development costs, stripping costs and management costs in mining the ore and on the basis of all these factors computed a realizable profit of $1,972,000. He then further reduced this figure to allow *35 a potential purchaser of the property a profit on his investment and stated that in his opinion the fair market value of the Flattop Property would be $1,183,000. [4]
It is difficult to understand respondent's position that Farmington's interest in Flattop was worthless as of December, 1955. In addition to the valuation testimony outlined above there are numerous indicia in this record which strongly militate against respondent. The evidence shows that at the December 10, 1955, meeting in which Farmington's three major creditors obtained the Farmington note secured by an assignment of Farmington's interest in Flattop, one of the three major creditors (McMaken) agreed to make further advances to Farmington up to $150,000 for the purpose of paying outstanding obligations and by early 1956 had actually advanced $130,000 to Farmington. Such action by a major creditor of Farmington can hardly be reconciled with the proposition that Farmington's only substantial asset at that time was worthless. We also consider it of some significance that Chase and Roscoe, both *36 of whom were knowledgeable individuals who had formerly been employed by the Atomic Energy Commission, each bought stock in Farmington in February, 1956, from a fellow employee when he left Farmington. There is also evidence in the record that a number of companies were anxious to acquire claims on the lignite properties in this area in 1955 and 1956. A witness who was formerly an official of one such company testified that the Flattop Property was then considered "the best property in the area." This same witness also testified that in 1955 and 1956 his company was actively pursuing plans to build a mill at Bowman, North Dakota, for the processing of the uraniferous lignite ores in that area and in fact made a firm written proposal in August, 1956 to the Atomic Energy Commission for such a mill. None of respondent's witnesses gave any opinion as to the precise fair market value of Flattop. One of respondent's witnesses, Alexander J. Speal, testified that the Atomic Energy Commission was purchasing lignite ores in the years 1954 through 1957 for test purposes. He also testified that in his capacity as an employee of the Atomic Energy Commission he had examined the 1955 data complied *37 for Flattop showing the extent of its reserves. He testified that this data (which Farmington apparently submitted to the Atomic Energy Commission in 1955) was "a complete report" and the "basic data was all there." Speal, however, quarreled with portions of the computation made by Farmington of the ore reserves on Flattop. He testified that Farmington used an incorrect tonnage factor (the cubic feet per ton of ore) in its calculations of reserves, that Farmington was not conservative enough in its pattern of test drillings, that too much reliance was placed on rim samples. Speal also testified that some of the test methods used by Farmington were not as reliable as other available methods. Speal did not express any opinion concerning the fair market value of Flattop as of December, 1955. We have considered this testimony, as well as the indications in the record that as of December 1955 the Atomic Energy Commission's buying program for uraniferous lignite ores was still in its initial tentative stages. The record also shows that Flattop was actually developed and exploited in 1962 and subsequent years (not by Farmington) and that the Atomic Energy Commission granted two allocations *38 for the mining of ore at Flattop based upon the known Flattop ore reserves prior to 1958. It also appears that mills were constructed by them in North Dakota and Colorado that were capable of processing uraniferous lignite ores. 1529 Respondent in his attempt to establish that Flattop was worthless in 1955 finds it significant that Farmington allowed its option to the Flattop mineral rights to expire in 1960. Our concern here is with the valuation of the property as of December, 1955, when the uranium purchasing program of the Atomic Energy Commission was in full cry. It appears, however, that in October, 1957, the Atomic Energy Commission unexpectedly announced a curtailment of its uranium procurement program and since the Commission by law provided the sole market for uranium the effect of such a curtailment on the interested mining community can easily be imagined. Such an abrupt change of policy by the Atomic Energy Commission late in 1957 could not possibly have been envisaged in December 1955. We need not speculate on the reasons that led Farmington to abandon its option to the Flattop Property. It is enough to say that the post-1957 climate in the uranium mining world *39 was vastly changed. We have considered all of the evidence and find, on the basis of this record that the fair market value of the Flattop Property as of December, 1955, was $1,183,000. Therefore, we also find that the petitioner's interest in Farmington [5] which he transferred to State Foundry in 1956 had a fair market value of, at least, $368,676.38 (representing the total consideration received by petitioner from State Foundry) and that consequently petitioner realized no taxable income in 1956 as a result of the transfer. We sustain petitioner on this issue. In view of our holding on the principal issue in favor of petitioner, it will not be necessary to discuss at length the petitioner's contention that the respondent, by reason of a prior settlement of a proposed liability for the accumulated earnings tax under section 531 against State Foundry for the years 1955 and 1956, is estopped from asserting in this case a taxable distribution to petitioner from State *40 Foundry in either 1955 or 1956. It will suffice to say that we have examined all of the available evidence with care and find no evidence of any closing agreements or other firm understanding that the settlement of the corporation's section 531 liability (the settlement called for a reduced section 531 surtax for 1955 and no surtax for 1956) was bottomed upon any understanding, express or implied, that no dividend or corporate distribution would be attributed to petitioner as a result of the transfer of his investment in Farmington to State Foundry. Decision will be entered for the petitioners. Footnotes
1. All section references will be to the 1954 Internal Revenue Code↩, as amended, unless otherwise noted.
2. Petitioner correctly points out that the total indebtedness assumed by State Foundry was $191,176.38, not $185,500, and that the total consideration for the transfer was therefore $368,676.38 rather than $363,000.↩
3. To reflect the transfer on its books, State Foundry debited "Mortgage receivable" in the amount of $514,676.38 and credited the "Due From Officers" and the "Deferred Income" accounts in the respective amounts of $368,676.38 and $146,000.↩
4. Hildebrand testified that he discounted the profit potential of $1,972,000 by 40 percent to reach this final figure.↩
5. We have indicated earlier in the opinion that this interest was a proportionate share of the $1,200,000 note executed by Farmington and secured by the option held by Farmington to the Flattop mineral rights.↩